[L. A. No. 24185.   In Bank.   Dec. 31, 1957.]

Estate of EMMA C. HEARD, Deceased. BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION (a National Banking Association), as Trustee, etc., Petitioner v. MOST WORSHIPFUL GRAND LODGE OF FREE AND ACCEPTED MASONS (an Unincorporated Association) et al., Appellants; SHIRLEY T. HEARD, as Guardian, etc., Respondent.

*Assigned by Chairman of Judicial Council.

No appearance for Petitioner.

Henry C. Clausen, Henry C. Clausen, Jr., Thomas J. Cunningham, John E. Landon and William R. Hulsey for Appellants.

Conron, Heard & James and Calvin H. Conron, Jr., for Respondent.

516

CARTER J.—Emma Heard, testatrix, a widow, died on November 23, 1939, leaving a will dated September 28, 1935. At the time of her death her blood relatives were a brother and a son, John, who was 42 years old, married to a woman 36 years old, but with no children. (He had been married before and divorced.) She left a small bequest to her brother and others including John, but the major portion of her estate she left to the Bank of America, National Trust and Savings Association (also named executor), in trust to pay from the income: $200 per month for life to John; $50 per month to Mrs. Cummings (testatrix' cousin) for life; $25 to one Rice for life; $50 to a servant, Eulalia, for life; $25 a month for the care of a dog; the remainder of the income was to be paid monthly to John "or if he be deceased, then to his lawful issue, if any, distributed per stirpes and not per capita" but if John should "leave no lawful issue at the time of his death" then the income shall be paid to May Cummings until her death and then to her "living issue."[1] If the income is not sufficient to pay all the payments above mentioned, the income should first be paid to John "or in case of his death to his lawful issue." If the income payable to John is not sufficient to provide for his needs, the trustee may make additional payments from the corpus and the same is true as to the "lawful issue" of John if he should die before the termination of the trust.

The trust shall terminate on the death of the "last survivor of all," the persons, that is Rice, May Cumming's issue and including the "lawful issue" of John who may be living when the testatrix dies and the cessation of Eulalia's employment during testatrix' life. Upon the termination of the trust, the corpus is to be "forthwith and outright paid over and delivered to the heirs of the lawful issue" of John but if "at" the termination of the trust "there should not then be living any lawful issue of" John, then the residue shall be paid over to appellants herein. There are spendthrift provisions, a contest clause, and a specification of the trustee's powers and compensation.

The trustee petitioned for instructions under section 1120 of the Probate Code[2] on how the property should be dis-

[1]In separate paragraphs it is provided that "Upon the death" of John "the residue of income shall be distributed among his lawful issue, if any, by right of representation," and if no issue the "accrued" income to May Cummings.

[2]"When a trust created by a will continues after distribution, the superior court shall not lose jurisdiction of the estate by final distribu-

tributed and it appears from the findings that John died on March 14, 1955; May Cummings died but her issue are still alive; Eulalia was not employed by testatrix at the latter's death; Rice is still alive; the dog is dead; hence the trust is not yet terminated; and on October 19, 1950, John and his wife adopted in this state John III, respondent herein, who was at that time about 7 years old, and his adoptive mother appears herein as his guardian; that the testatrix, by reference to "lawful issue" of John intended to include adopted children including respondent; that respondent is entitled to the first $200 income; that the trust is not terminated, accordingly an order was entered instructing the trustee to pay from the income $200 per month to respondent, then $25 monthly to Rice and the balance to respondent. Appellants[3] appeal from that order. While it is clear the trust has not yet been terminated because Rice is still alive and the appellants, children of May Cummings, are still alive, who claim the income that was to go to John if he died without lawful issue; and the other appellants appeal because they feel the determination that respondent, John's adopted son, was John's lawful issue, thus excluding May Cummings' two children from the income, might be res judicata on that question when the trust is terminated.

This estate has been on appeal before in *Estate of Heard*, 25 Cal.2d 322 [153 P.2d 553], which held the trust provisions valid and that the lawful issue of John would take on termination of the trust, and found invalid one paragraph of the will, not here important. (See also *Estate of Heard*, 107 Cal. App.2d 225 [236 P.2d 810, 27 A.L.R.2d 1313].) Accounts have been heretofore filed by the trustee and the estate was distributed to the trustee on the trusts as stated in the will. The sole issue presented is whether "lawful issue" of John included a child he adopted after the will was made and the testatrix was dead.

---

tion, but shall retain jurisdiction for the purpose of determining to whom the property shall pass and be delivered upon final or partial termination of the trust, to the extent that such determination is not concluded by the decree of distribution, of settling the accounts and passing upon the acts of the trustee and for the other purposes hereinafter set forth. . . . The trustee may also petition such court, from time to time, for instructions as to the administration of the trust.'' (Prob. Code, § 1120.) An appeal may be taken from an order giving instructions. (*Estate of Charters*, 46 Cal.2d 227 [293 P.2d 778].)

[3]Three of appellants are the ones to receive the corpus of the trust on its termination *if John left no lawful issue,* the other two appellants (May Cummings' issue) were to receive the income from the trust if John died without lawful issue.

In ascertaining whether John III was lawful issue in the will it was stipulated that the will was drawn by a lawyer; that appellants La Berge and Norris Cummings are the issue of May and the second cousins of the testatrix. John was married in 1933 before the will was made and testatrix died; he was in ill health. The adoption of John III took place later.

The term "children" in a will may include adopted children although adopted after the testator's death. (*Estate of Stanford, ante,* p. 120 [315 P.2d 681]; *Meek* v. *Ames,* 177 Kan. 565 [280 P.2d 957].) The same has been applied to "heirs" (see *Major* v. *Kammer,* —— Ky. —— [258 S.W.2d 506]); to "descendants, heirs or survivors" (*Hayes* v. *St. Louis Union Trust Co.,* —— Mo. —— [280 S.W.2d 649]; *St. Louis Union Trust Co.* v. *Greenough,* —— Mo. —— [282 S.W.2d 474]); to "lawful issue" (see *Riddle* v. *Peters Trust Co.,* 147 Neb. 578 [24 N.W.2d 434]; see also 70 A.L.R. 621; 144 *id.* 670). It is said in *In re Upjohn's Will,* 304 N.Y. 366 [107 N.E.2d 492, 494]: "Embodied in our adoption statute is the fundamental social concept that the relationship of parent and child, with all the personal and property rights incident to it may be established, independently of blood ties, by operation of law . . . 'In the eye of the law, therefore, adopted children are lineal descendants of their foster parent. They are in the line of descent from him through the command of the statute, the same as if that line had been established by nature.' *Matter of Cook's Estate,* 187 N.Y. 253, 261 [79 N.E. 991, 994]. In harmony with the legislative policy thus expressed, the adoption statute has been most liberally and beneficently applied. . . .

"Wills, too, must be read and construed in harmony with the legislative policy of placing adopted children on a level with natural born offspring. See *Gilliam* v. *Guaranty Trust Co.,* 186 N.Y. 127, 138 [78 N.E. 697, 700]; *Matter of Ellis' Estate,* 178 Misc. 491, 492 [34 N.Y.S.2d 884, 885]." It has been held with reference to the anti-lapse statute (see Prob. Code, § 92) that an adopted child is a "lineal descendant" of his adoptive parents. (*Estate of Esposito,* 57 Cal. App.2d 859 [135 P.2d 167]; *Estate of Tibbetts,* 48 Cal.App. 2d 177 [119 P.2d 368]; *Estate of Moore,* 7 Cal.App.2d 722 [47 P.2d 533, 48 P.2d 28]; see *Estate of Winchester,* 140 Cal. 468 [74 P. 10].) It is said in the Winchester case at page 469: "In *Pierce* v. *Rickard,* 18 R.I. 142, it was held that by the well-settled current of authority *the word 'issue'*

*includes all descendants, and as the statute gives to an adopted child the status of a descendant, all the legal consequences and incidents thereof follow, the same as though the child was born in lawful wedlock.* (*Hartwell* v. *Tefft,* 19 R.I. 646.) In *Warren* v. *Prescott,* 84 Me. 483, it was held that a legally adopted child is a lineal descendant of its adopting parents; and if, as declared by the Civil Code, an adopted child is to be 'regarded and treated in all respects as the child of the person adopting,' and the two 'sustain towards each other the legal relation of parent and child, and have all the rights and be subject to all the duties of that relation,' it must follow that the children of such adopted child take by inheritance as issue of the adopting father. [Citations.] Otherwise, the child adopted and the adopting parent would not sustain towards each other the relation of parent and child. [Citation.] In the *Estate of Wardell,* 57 Cal. 491, it is said: 'The term "child" as used in Civil Code, section 1307, of the law of descent and succession must relate to *status,* not to origin.' " (Emphasis added.) Certainly some consideration must be given to such construction of statutes when we are considering private instruments.

We have pointed out in *Estate of Stanford, ante,* p. 120 [315 P.2d 681], the policy in this state to give to an adopted child the same status as a biological one, and that the *Estate of Pierce,* 32 Cal.2d 265 [196 P.2d 1], merely holds that there was sufficient evidence aside from the face of the will to show the testator intended lawful issue not to include adopted children. At the time the will here involved was prepared and at the time of the death of the testatrix section 257 of the Probate Code provided: "An adopted child succeeds to the estate of one who has adopted him, the same as a natural child; and the person adopting succeeds to the estate of an adopted child, the same as a natural parent. An adopted child does not succeed to the estate of a natural parent when the relationship between them has been severed by the adoption, nor does such natural parent succeed to the estate of such adopted child." (But see 1955 amendment to section 257 which broadens scope of inheritance by adopted child.) In an excellent article by Professor Jacobus tenBroek (see 22 So.Cal.L.Rev. 89; 6 Hastings L.J. 261), it is pointed out in detail the effect of adoption, its steady increase and the necessity that an adopted child be treated the same as a biological child of the adoptive parents, and it is said: "If the genetic connection is what is meant, then it must be noted

that the act of transmission is accomplished in a comparatively short time and does not necessarily involve any after-contact or relationship. Is this 'natural relation' more natural or more important than the mutual, reciprocal and continuous relation between parent and child, which may occur in adoptive or non-adoptive families, involved in the rearing of a child from infancy to maturity with all of the impact of day-to-day care and upbringing upon character, psychology, outlook, emotional make-up, and even biology which that entails? In this sense, does not nature 'do the work of nature' and create one a child who by nature is a stranger? In fact, in this sense, does not nature do the work of nature and create one a child who by nature is not a stranger? . . .

"The over-all purpose of these sections, taken together with Civil Code, Section 221, evidently was to create a new legal relationship of parent and child which normally would be coupled with the natural relation of parent and child springing from the fact that that is the relationship in which they actually live; and to make the new legal relationship legally the same as the old legal relationship of parent and child which normally is coupled both with the genetic and the factual natural relation of parent and child. . . .

"In general, despite the persistent emergence of these underlying conceptions, the California Supreme Court has taken the statutory language seriously. It has held that: the adoptive parent has the same right to paramount custody as the biological parents and, after adoption, guardianship of the adopted child is therefore improper. The residence of the adopting parent becomes the residence of the child; adopted children are within the term 'any lineal descendant' and are thus exempted from the burden of a collateral inheritance tax; an adopted child is a 'child' within the meaning of Section 1365 of the Code of Civil Procedure and thus entitled to letters of administration of the estate of the adopting parent; a court having control of a child's custody by virtue of the divorce of its parents is ousted of its jurisdiction by adoption; 'an adoptive parent may contract with the natural parents to take care of, support and educate the adopted child for compensation as freely and legally as such contract could be made by the adoptive parent with a stranger to the blood of such child'; an adopted child is not part of the immediate family of his biological father for the purpose of having set aside as exempt property insurance proceeds paid into the estate of such father.

"The California Supreme Court has adhered to the same line with respect to inheritance rights as between parent and child. In *In re Newman* [75 Cal. 213, 219 (16 P. 887, 7 Am.St.Rep. 146)], the right of the adopted child to inherit from the adoptive parents was held to follow inevitably from the adoption statutes. 'The provisions of sections 227 and 228,' said the court, 'extend to all the rights and duties of natural parents and children. The language is general and comprehensive. The use of the word "issue," in section 1386, does not limit the right of inheritance to the natural children only. . . . The word "issue" is there used in the same sense as the words "child" and "children." ' ' . . . Certainly it is with respect to succession rights that the two natural relationship theories—the genetic theory and the theory that 'natural inclinations and affections' derive from family experience and contact—come into sharpest conflict. On the family experience and contact theory, the relatives of the adoptive parents, lineal and collateral, become the relatives of the adopted child. Normally, they are the only grandparents, uncles, aunts, brothers, sisters and cousins he knows. His genetic grandparents, uncles, aunts, brothers, sisters and other relatives in a sizable percentage of cases of illegitimate birth will not even have been aware of his existence; and in many other instances will have known him only very briefly prior to his surrender for adoption as a very young infant. Moreover, even if property is to follow the genes, collaterals would have to be excluded since they do not inherit the genes being followed but only possess genes that were drawn from a common stock. Thus, brothers and sisters especially, (but all other collateral relatives as well) both on the common family experience and contact theory and on the genetic theory, must be those of the adoptive family whether born before or after the adoption or even if acquired by adoption." (6 Hastings L.J. 261, 276.) ██ Moreover words in a private instrument should ordinarily, in the absence of a showing of a contrary intent, be given the effect given them by the statutory or case law. (Rest., Contracts, § 234; *Weinreich Estate Co. v. A. J. Johnston Co.*, 28 Cal.App. 144, 146 [151 P. 667]) and this is applied to wills: ██ "Testamentary provisions should be construed as far as possible in harmony with law and public policy. . . . The testator is bound to know existing statutes affecting testamentary dispositions. . . ." (95 C.J.S., Wills, § 589.) The same should be true as to whether lawful issue includes adopted children: "In ascertaining the testator's in-

522

tention, the adoption statutes . . . made may be considered. . . . In view of such statutes, 'issue' or 'lawful issue' may include adopted children. . . .

"In some jurisdictions in which statutes entitle the adopted child to succeed to the estate of the adopting parents in the same manner as if it had been a natural child of such parent . . . the term 'issue,' as used in its primary sense of lineal descendants generally, will include an adopted child." (95 C.J.S., Wills, § 666(c)(3)(b).) ██ We cannot suppose that wills are made in a vacuum; that the status of an adopted child being the same as a biological offspring, which is the public policy of the state, may be completely ignored, or that it was ignored by a testator when making a will any more than he may be said to ignore many other rules of law and public policy. When he has not said anything about "adopted" children using that word or the equivalent, the court in seeking his intent is in fact endeavoring to ascertain what his wishes would be if adopted children were called particularly to his mind. Lacking that, the court must assume, unless a contrary intent is expressed, that he intended that his will would fit it and be compatible with the general body of the law and public policy. Otherwise the court is left with little if any basis for interpreting the instrument. ██ Courts thus, by necessity, draw on the statutes, case law and public policy in construing an instrument as they must suppose that the draftsman did not intend to pursue a course contrary to them unless he so states. The draftsman of wills may exclude adopted persons if he wishes.

██ While the will does leave the bulk of the estate to blood relatives, testatrix' cousin Mrs. Cummings, and her son John, we do not find therein any indication that an adopted child was to be excluded in view of the public policy to treat adopted children the same as blood children. Nor is it significant that prior to the 1955 amendment to section 257 of the Probate Code it had been indicated that adopted children inherit from but not through their adoptive parents (see *In re Darling,* 173 Cal. 221 [159 P. 606]; *Estate of Calhoun,* 44 Cal.2d 378 [282 P.2d 880]). Assuming that is correct as to cases arising prior to the effective date of said amendment, it affords no solution here where we are concerned not with inheritance but rather with whether the words "lawful issue" used in a will includes an adopted child. There is no more probability that a person will adopt a child than that he will

deliberately have a blood child. Indeed, it appears that from all the statistics it is more difficult to adopt a child than to have one naturally; the demand for children available for adoption exceeds the supply. In either case he is not foisting a child on his relatives and there is no magic by which a blood child may develop into a more desirable child than one adopted. The kin of the parents may well find an adopted child much to their liking while finding little satisfaction in their relationship with a blood child. Being of the same blood does not assure them of a relative fitting their tastes. These things being so nebulous afford no grounds for excluding adopted children from the term "lawful issue."

The order is affirmed.

Gibson, C. J., Traynor, J., Schauer, J., Peters, J. pro tem.,* Dooling, J. pro tem.,* and Wood (Fred B.), J. pro tem.,* concurred.